E-FILED
Friday, 09 October, 2026 03:28:34 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| MAQUESHA RAMEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-4214-SLD |
| | ) | |
| MICHAEL LONG, | ) | |
| | ) | |
| Respondent. | ) | |

ORDER AND OPINION

Before the Court is Petitioner Maquesha Ramey's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. 1). Ramey is serving a 65-year imprisonment sentence for first-degree murder. She challenges her conviction and sentence, arguing incriminating statements she made to the police should have been suppressed, evidence of other her crimes was improperly admitted, and the sentencing judge failed to consider certain mitigating evidence. For the reasons below, the Court DISMISSES Petitioner's Petition with prejudice and DECLINES to issue a certificate of appealability.

## I. BACKGROUND[1]

In December 25, 2020, Ramey and her boyfriend Michael Hubbard broke up. On January 4, 2021, after acquiring a gun and a wig, Ramey drove to Hubbard's residence in Galesburg, Illinois, and fatally shot Hubbard's new girlfriend, Rachel Likes. After she called 911 twice after the murder denying she was involved in the crime, law enforcement began

[1] The facts are taken from the undisputed facts in Respondent's Response (Doc. 8), which are consistent with the official records from Petitioner's state court proceedings. (Doc. 9). *See* 28 U.S.C. § 2248 ("The allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."). The factual determinations of the state court are presumed to be correct, unless a petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

investigating her. Along with Ramey's own incriminating statements, the results of the investigation led to Ramey's murder charges and conviction.

**A. Pretrial Motions**

Prior to the jury trial, the trial court denied two pretrial motions filed by Ramey: (1) a motion to suppress incriminating statements Ramey made during custodial interviews on January 2, 2021 and January 5, 2021; and (2) a motion *in limine* seeking to prevent evidence of Ramey's prior conviction from being introduced.

1. Motion to Suppress: The investigation quickly became focused on Ramey. Ramey was arrested and gave two recorded statements to police: one on January 4, 2021, the second on January 5, 2021. Ramey made incriminating statements in both of these interviews that she sought to suppress before the trial claiming that, prior to making the statements, the detectives had ignored Ramey's invocation of her right to remain silent and right to an attorney.

In the first interview, after receiving and waiving her *Miranda* rights, Ramey initially denied any involvement in the shooting and claimed that she had been driving back from Mississippi when the shooting occurred. She reported that she had been having problems with Hubbard and he had done the same "s*** to his baby mama." *People v. Ramey*, 2023 IL App (4th) 220888-U, ¶ 9. However, Detectives Mark McLaughlin and Timothy Spitzer confronted Ramey with inconsistencies in her story and evidence that contradicted her statements, including that her vehicle had been captured on a security camera. *Id*. The detectives then told her that her vehicle was described as being at the shooting. *Id*. Ramey then made the following statement:

> Okay, I don't have nothing else to say. You can call his baby mama and get me a lawyer. Because if you're going to sit here and tell me that *** if you didn't see no car on camera, or y'all got no proof of any of this, y'all need to let me go.

*Id*. Detective McLaughlin responded: "I'm telling you, I saw it on the housing camera." *Id*. ¶ 10. Ramey then stated, "That's the housing camera. You said that my car left housing at the time of the shooting. So listen to me if my car—what gun am I going to shoot with?" *Id*. The interview continued and Ramey denied having a gun and continued to deny being involved.

About five minutes later, in response to Detective McLaughlin asking questions about who else was in the cars at the time of the shooting, Ramey said "If you're going to charge me, go ahead. If not, I don't [unintelligible] nothing else, alright [unintelligible]." *Id.* ¶ 11. Detective McLaughlin then told Ramey, "I'm not gonna sit here and make you talk if you don't wanna talk. But I'm trying to give you your chance to talk. If everyone else is gonna talk, it's not fair if everyone else talks and you don't get a chance to talk." *Id.* The interview continued, and Ramey eventually stated she was "guilty" and that she "retaliated" against Likes. Ramey also claimed that Likes pulled out the gun, she had tried to grab the gun from Likes, and the shooting was an accident. *Id*.

The detectives interviewed Ramey a second time on January 5, 2021, after Ramey asked to speak with them again. *Id.* ¶ 12. Ramey was again read her *Miranda* warnings and again waived them. Ramey told the detectives she wanted to talk and that she had gone to Hubbard's residence to get her son's clothes. *Id*. She stated that she and Likes wrestled over the gun and she took it from Likes. *Id*. She claimed that the gun went off three times and that she "waved the gun" later and the gun may have gone off then as well. *Id*. Ramey said the gun was Hubbard's and that she tossed the gun out the car window as she left the "scene." *Id*.

Ramey's motion sought to suppress the statements from both interviews. She claimed that she invoked her right to remain silent and to an attorney when she said "Okay, I don't have nothing else to say. You can call his baby mama and get me a lawyer," and when she later said

"If you're going to charge me, go ahead. If not, I don't [unintelligible] nothing else, alright [unintelligible]." *Id*. The State opposed the motion and presented testimony from the detectives, who stated that Ramey's comments were hard to understand at the time of the interview and did not make sense to him. Detective McLaughlin also testified that Ramey's first comment was made "all together" with other statements and Ramey continued speaking. *Id*. ¶ 13. And, with regards to the second statement, Detective McLaughlin said that nothing in Ramey's body language or the context indicated to him that she did not want to talk. *Id*. The trial court denied the motion, finding she "spoke mostly unsolicited for lengthy periods" and that she did not unambiguously request an attorney and did not clearly invoke her right to remain silent. *Id*. ¶ 14.

2. Motion *in limine* re Other Crimes Evidence: Ramey also filed a motion *in limine*, seeking to prevent the state from referencing or eliciting testimony about her prior conviction. Ramey had referred to her status as a felon and that she was on probation in the recorded interviews with the police and in 911 calls she made after the interview. *Id*. ¶ 15. She also wanted to exclude testimony from her probation officer regarding the pass Ramey had been given to travel to Mississippi. *Id*. The trial court denied the request. *Id*.

**B. Trial**

The case proceeded to trial, where the state presented evidence that Ramey shot Likes and had taken steps in the days and hours proceeding the murder to obtain a weapon and change her appearance. Hubbard testified that just before 5 p.m. on January 4, 2021, he was returning to his home in Galesburg, Illinois, when he heard gunshots on his street. He then saw a dark-colored car pulling away. Police found Likes dead in her car in front of Hubbard's residence. Her four-year-old son was in the backseat of the car at the time of the shooting. Likes had been shot multiple times and had gunshot wounds to her right index finger, left eye, chest, and left leg.

*Ramey*, 2023 IL App (4th) 220888-U, ¶ 17. Nine defects were found on the driver's side of her vehicle that were consistent with bullet holes. *Id*. A bullet also went through the front window of Hubbard's residence and one 9-millimeter cartridge case was located on the ground underneath the driver's door of Likes' vehicle. *Id*.

About a half hour after the shooting, Ramey called 911. The recording was played at the trial. On the call, she told the operator that she had heard from family members that Hubbard was telling police that she had "done something to his girlfriend." Although Ramey's 911 call had connected to the police in Galesburg, Illinois, Ramey claimed that she was still on her way from Mississippi, where she had been on a pass from her probation officer. The 911 operator told Ramey that an officer would return the call. However, before an officer could do so, Ramey called 911 again several minutes later, was again connected to the Galesburg police, and said that she had heard that her "name ran across the scanner for something" involving Hubbard. She again said that she was not in town and that she was still on the highway trying to get back.

As a result of these 911 calls, the police began investigating Ramey. The investigation pieced together Ramey's actions in the days leading up to the murder: Ramey and Hubbard broke up on December 25, 2020. Shortly thereafter, Hubbard began dating Rachel Likes. Investigators found that Ramey had repeatedly searched for Hubbard's name on Facebook after they broke up. On December 28, 2020, Ramey asked her probation officer for permission to visit family in Mississippi from December 29, 2020, to January 3, 2021. Her probation officer gave the permit and Ramey went to Mississippi.

On December 31, 2020, a video of a Glock handgun was created on Ramey's phone. Two days before the murder, Ramey also conducted several internet searches related to Glock firearms. Messages from Ramey's Facebook account indicated that she met with Deondre

McGill of Gulfport, Mississippi and paid him via "cash app" for "some accessories." The day before the murder, a video was created on Ramey's phone showing Ramey firing a Glock handgun.

The day of the murder, January 4, 2021, surveillance footage showed Ramey returning to her Galesburg residence shortly before 1:00 p.m. She texted one of her contacts that she was in town, but not to tell anyone. Ramey watched several YouTube videos explaining how to install a bald cap and wig. About 20 minutes before the murder, she texted a photo of herself in a wig and a mask. Then surveillance video showed her leaving her residence, driving her dark-colored Chevrolet Malibu, and wearing hair that appeared longer than it had when she had arrived home earlier in the day.

After the murder, Ramey's dark colored car was discovered abandoned behind a warehouse. Inside the car, police found accessories for a Glock 9-millimeter firearm (a magazine loader and an optic) and several spent 9-millimeter cartridge cases. Two months later, a red DoorDash bag was recovered from a ditch in Galesburg, which contained a wig, a Glock 9-millimeter handgun, two magazines, and eight more spent cartridge cases. Forensic testing showed that the cartridge cases recovered from the scene of the shooting, Ramey's car, and the DoorDash bag were all fired from the same gun: the Glock found in the DoorDash bag, which was registered to Deondre McGill, who was the man Ramey had met in Mississippi. During a search of Ramey's home, police found another wig and packaging for a wig cap.

Ramey's recorded statements to police, as described above, were also played for the jury. These included Ramey's admission that she was guilty, that she was involved in the shooting and her claim that it was an accident.

Ramey testified in her own defense, telling a different story than she had relayed to the detectives. She testified that she was a mother of three and had worked various jobs, including a job at DoorDash. She had dated Hubbard from August to December 2020. While they had not gotten married, she considered herself married to him and she obsessed over him after they broke up. She admitted that, while in Mississippi, she purchased a gun from McGill and claimed that she had intended to bring the gun back to Illinois and sell it to some gang members.

Ramey also acknowledged returning to Illinois when the surveillance footage showed she did. She went to a hair store to purchase a wig to cheer herself up. After she put on the wig, she went to Hubbard's residence to collect some of her belongings and discuss their relationship; she said that she did not know about Likes at the time. However, at Hubbard's house, she testified that she met Likes, who introduced herself as Hubbard's girlfriend. Hubbard arrived as she was talking to Likes. After talking to Hubbard, she retrieved her gun from the car. Hubbard wrestled the gun away from her and it went off three or four times. Ramey claimed to have fled and heard additional gunshots. When Ramey heard that Hubbard had identified her as having been involved in the shooting, she got scared and called the police in an attempt to "avoid responsibility." She said that she had lied in her recorded statements to police to protect Hubbard and to protect herself from Hubbard.

The jury found Ramey guilty of first-degree murder and found that Ramey had personally discharged the firearm that proximately caused the death of another. The court subsequently sentenced Ramey to 65 years in prison.

**C. Direct Appeal and State Postconviction Petition**

Ramey appealed, raising three claims: (1) the trial court erred in denying her motion to suppress; (2) the trial court erred in admitting other crimes evidence when it allowed the jury to

hear that she was on probation at the time of the murder; and (3) her sentence was excessive. The Illinois Appellate Court disagreed on all three claims and affirmed her conviction and sentence. *Ramey*, 2023 IL App (4th) 220888-U, ¶ 94. The court found the first claim was meritless because Ramey had not clearly invoked her right to be silent or to a lawyer. *Id*. ¶¶ 57–58. Moreover, the court found that even if it was an error to not suppress the statements from the January 4, 2021 interview, the admission of the January 5, 2021, statements was not in error and made any error regarding the January 4, 2021, statements harmless. *Id*. ¶¶ 60–67. The court found the other evidence claim was meritless because the evidence regarding Ramey's probation — testimony from her probation officer and her 911 statements — was admissible for the non-propensity purpose of establishing the dates of Ramey's travel to Mississippi. *Id*. ¶¶ 69–79. Finally, the court found that the third claim was meritless because the trial court did not abuse its discretion in weighing the aggravating and mitigating factors at sentencing. *Id*. ¶¶ 81–92.

Ramey filed a Petition for Leave to Appeal (PLA) with the Illinois Supreme Court, raising only her suppression claim. The Illinois Supreme Court denied the PLA on January 29, 2025. *People v. Ramey*, 251 N.E.3d 393 (Table).

Ramey then filed a postconviction petition in July 2025, in which she raised the three claims she had raised on direct appeal, as well as ineffective assistance of counsel claims. The trial court dismissed the post-conviction petition ion September 2025, and Ramey did not appeal.

**D. Federal Habeas Petition**

Ramey filed this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) on November 24, 2025. She raises four grounds for relief: (1) the trial court erred in denying her motion to suppress when her statements were taken in violation of her *Miranda* rights, *id*. at 7; (2) her rights statements were improperly used as impeachment in violation of her Fifth and

Fourteenth Amendment Rights, *id.* at 10; (3) she was denied a right to a fair trial when other crime evidence was admitted at trial and the jury was never instructed not to consider the other crimes evidence as propensity evidence, *id*. at 12–13; and (4) her constitutional rights were violated when she was sentenced to 65-years imprisonment without proper consideration of evidence in mitigation, *id*. at 15.

Respondent has filed a response in opposition, arguing her grounds for relief are either procedurally defaulted or meritless. (Doc. 8). Respondent's response also evaluated additional grounds Ramey had brought in her state postconviction petition: that trial counsel was ineffective in numerous ways and that the trial court abused its discretion when it found no mitigating factors at sentencing. *Id.* at 8. Ramey filed a combined Response and Motion to Amend Petition (Doc. 10). In her motion to amend, Ramey clarifies that she only intended to bring the four grounds for relief that wrote on her Petition and not the additional grounds that were raised in her state postconviction proceedings and were only attached to her Petition as exhibits. The Court already granted this motion and will only consider the four grounds for relief on the face of Ramey's Petition. This Order now follows.

## II. DISCUSSION

### A. The Illinois Appellate Court's Resolution of Ramey's Claims Regarding the Use of Her Incriminating Statements is Entitled Deference.

Ramey's first two grounds for relief address the same alleged constitutional violation: she alleges that her incriminating statements to the detectives from her January 4, 2021 and January 5, 2021 interviews should have been suppressed. (Doc. 1 at 7, 10). Under the Fifth Amendment, "no person 'shall be compelled in any criminal case to be a witness against himself.'" *Smith v. Boughton*, 43 F.4th 702, 708 (7th Cir. 2022) (citing U.S. Const. amend. V.). To effectuate that

right, in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court "established a number of prophylactic rights designed to counteract the "inherently compelling pressures" of custodial interrogation." *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991). These rights, as relevant here, include the right to remain silent and the right to counsel. *Id*. An individual in custody can waive those rights and speak with police, if the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444. Even after an initial waiver, an individual retains the right to revoke the waiver and cut off questioning. *Michigan v. Mosley*, 423 U.S. 96, 103 (1975). If an individual invokes their right to counsel or to remain silent, an officer must cease questioning. However, an officer may continue questioning if a suspect makes ambiguous or equivocal references to an attorney or to their right to remain silence. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Davis v. United States*, 512 U.S. 452, 458 (1994). "Courts applying the *Thompkins* standard have thus looked for simple statements clearly indicating that the suspect wished to bring police questioning to a close." *Smith v. Boughton*, 43 F.4th 702, 709 12 (7th Cir. 2022). "The key inquiry," is "whether a reasonable officer under the circumstances would understand the defendant's statements as an unequivocal invocation of the right to remain silent." *Id*. (citing *Davis*, 512 U.S. at 458-59).

Ramey raised this claim on direct appeal, which the state court adjudicated on the merits. Accordingly, the Court may only grant habeas relief "the state court's 'decision' was 'contrary to, or involved an unreasonable application of, clearly established Federal law,' or 'was based on an unreasonable determination of the facts in light of the evidence presented' in state court." *Klein v. Martin*, 607 U.S. 213, 220 (2026) (quoting 28 U.S.C. § 2254(d)). This standard acts as a "limited safeguard" that "protects against 'extreme malfunctions' in the state courts' adjudication

of constitutional claims" and requires federal courts "to give the 'benefit of the doubt' to" state court merits decisions. *Id*. (citations omitted).

"[A] decision is deemed "contrary to" clearly established federal law if the state court reached 'a conclusion opposite to that' of the Supreme Court on a legal matter [ ] or if the state court arrived at an outcome in direct contradiction to a 'materially indistinguishable' case decided by the Supreme Court." *Gambaiani v. Greene,* 137 F.4th 627, 632 (7th Cir. 2025) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application of" clearly established federal law if the state court "identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Coleman v. Hardy,* 690 F.3d 811, 814 (7th Cir. 2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 407 (2000). However, this showing is more than "clear error;" instead a petitioner must "establish that the state court 'blunder[ed] so badly that every fairminded jurist would disagree' with the decision." *Klein,* 607 U.S. at 596 (quoting *Mays*, 592 U.S. at 392). In conducting this review, courts must "look to the last reasoned state court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Pierce v. Vanihel*, 93 F.4th 1036, 1044 (7th Cir. 2024) (internal quotations omitted).

The Illinois Appellate Court issued "the last reasoned state court decision" on Ramey's claim. *Ramey*, 2023 IL App (4th) 220888-U. In that decision, the Illinois Appellate Court correctly cited the standards above, including *Miranda* and *Thompkins*, *id.* ¶¶ 52–55, makings its decision not contrary to clearly established Supreme Court precedent, *Gambaiani*, 137 F.4th at 632.

Moreover, the court's decision did not unreasonably apply this precedent to Ramey's claim. The Illinois Appellate Court first noted that the police read Ramey her *Miranda* rights and she waived her rights and submitted to questioning. *Ramey*, 2023 IL App (4th) 220888-U, ¶ 57. After about fifteen minutes, Ramey made her first comment she claims revoked the waiver:

> Okay, I don't have nothing else to say. You can call his baby mama and get me a lawyer. Because if you're going to sit here and tell me that *** if you didn't see no car on camera, or y'all got no proof of any of this, y'all need to let me go.

*Id.* The Illinois Appellate Court noted that these comments were made after the detectives began challenging. *Id*. Given that context, the court found that her comments "could be viewed as an assertation that she had no additional or alternative information to provide the detectives in response to their challenge. *Id*. While Ramey also said "get me a lawyer," the Illinois Appellate Court noted the context of this statement did not appear to actually be asking for questioning to stop. *Id.* ¶ 58. Rather, given the fact that she continued talking and continued challenging the detectives' evidence in the same sentence, the court found that her "comments appear to be an attempt to argue with the detectives and deny their assertions" and "also indicate that she was attempting to persuade the detectives of her purported innocence." *Id*.

The Court cannot find that this analysis "unreasonably applied" Supreme Court precedent to the facts here. Ramey's comments taken in isolation may indicate an revocation of her waiver, but, even then, it was not a clear revocation. However, the Illinois Appellate Court reasonably and correctly looked not just to the statements themselves, but the entire context and circumstance of the statements. *See Smith*, 43 F.4th at 711 ("context is an important factor in the plain meaning analysis"). Ramey did not stop speaking after making these statements, instead, without prompting, she continued to challenge the evidence and argue with the detectives about

their proof. *See also, United States v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006) (finding the statement "I'm not gonna talk about nothin" that was made in a series of taunts about how little evidence the police had was not an unambiguous invocation of his right to remain silent because it was best understood as a provocation to the police about how little evidence they would get from the interview); *McNeil*, 501 U.S. at 178 (An assertion of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police."). The Illinois Appellate Court's decision is thus entitled to deference.

**B. Ramey's Remaining Grounds, Three and Four, are Procedurally Defaulted.**

Ramey's remaining grounds for relief—that other crimes evidence should not have been admitted and her sentence was unconstitutional—were not raised through one full round of state court review. Prior to considering the merits of a petitioner's claims, federal courts "must consider which claims have been procedurally defaulted." *Id*. One way for a state prisoner to procedurally default on a federal claim is "if [s]he fails to 'fairly present' it 'throughout at least one complete round of state-court review, whether on direct appeal of [her] conviction or in post-conviction proceedings,'" *Clemons*, 845 F.3d at 819 (quoting *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014)), and "it is clear that those courts would now hold the claim procedurally barred," *Perruquet v. Briley,* 390 F.3d 505, 514 (7th Cir. 2004). Accordingly, "[s]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," which in Illinois requires the petitioner to "include his claims in a petition for leave to appeal to

the Illinois Supreme Court." *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018)(quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845–46 (1999)).

"Procedural default may be excused . . . where the petitioner demonstrates either (1) 'cause for the default and actual prejudice' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Snow*, 880 F.3d at 864 (quoting *Thomas*, 822 F.3d at 386). "[T]he miscarriage of justice exception applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *Wilson v. Cromwell*, 69 F.4th 410, 421 (7th Cir. 2023) (internal citations omitted).

Ramey raised these claims in her direct appeal to the Illinois Appellate Court, but failed to include them in her PLA. She also raised them in her postconviction petition in the circuit court, but failed to appeal the dismissal of these claims. Accordingly, these claims are procedurally defaulted. In her reply, Ramey states that she "exhausted all remedies that were provided by Logan Correctional Center Law Library to her." (Doc. 11 at 2). To the extent Ramey is claiming that the prison library mislead her on her exhaustion obligations, such a claim is not sufficient to excuse procedural default. *See, e.g., Jannke v. Gierach,* 159 F.4th 517, 523–24 (7th Cir. 2025) (noting that ignorance of filing deadlines does not establish cause and a prison library's miscalculation of deadlines or its general failure to assist a petitioner is not sufficient to excuse procedural default because there is no right to assistance of counsel in postconviction proceedings). Ramey had not presented any other basis to find cause or prejudice, nor has she argued a miscarriage of justice. Accordingly, the Court finds that her grounds for relief 3 and 4 must be dismissed as inexcusably procedurally defaulted.

## III. CERTIFICATE OF APPEALABILITY

Should Ramey wish to appeal this decision, she must obtain a certificate of appealability.

28 U.S.C. § 2253(c)(1). A certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a claim is resolved on procedural grounds, a certificate of appealability should issue only if reasonable jurists could disagree about the merits of the underlying constitutional claim *and* about whether the procedural ruling was correct. *Flores-Ramirez v. Foster*, 811 F.3d 861, 865 (7th Cir. 2016). The Court does not find reasonable jurists could disagree that Ramey's claims are either procedurally defaulted or entitled to deference under 28 U.S.C. § 2254(d). Accordingly, the Court declines to issue a certificate of appealability.

## IV. CONCLUSION

For the reasons above, the Court DIMISSES Petitioner Maquesha Ramey's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) with prejudice. The Court DECLINES to issue a certificate of appealability. This case is CLOSED. The Clerk is DIRECTED to issue judgment in favor of Respondent.

Signed on this 9th day of October 2026.

/s/ Sara Darrow
Sara Darrow
United States District Judge